<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| MOHAMMAD MAHDI AHMAD HASSAN QATANANI and CLAUDIA SLOVINSKY, | |
| *Plaintiffs*, | Civil No.: 12-4042 (KSH) (CLW) |
| v. | |
| DEPARTMENT OF JUSTICE AND ITS COMPONENT FEDERAL BUREAU OF INVESTIGATION; and DEPARTMENT OF HOMELAND SECURITY AND ITS COMPONENT U.S. CUSTOMS AND BORDER PROTECTION, | |
| *Defendants*. | |

---

| | |
|---|---|
| MOHAMMAD MAHDI AHMAD HASSAN QATANANI and CLAUDIA SLOVINSKY, | |
| *Plaintiffs,* | Civil No.: 12-5379 (KSH) (CLW) |
| v. | |
| DEPARTMENT OF HOMELAND SECURITY AND ITS COMPONENT U.S. CITIZENSHIP AND IMMIGRATION SERVICES and U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and DEPARTMENT OF JUSTICE AND ITS COMPONENT FEDERAL BUREAU OF INVESTIGATION, | <u>**Opinion**</u> |
| *Defendants*. | |

---

**Katharine S. Hayden, U.S.D.J.**

**I.      Introduction**

Mohammad Mahdi Ahmad Hassan Qatanani ("Qatanani") and Claudia Slovinsky ("Slovinsky") filed two separate Freedom of Information Act ("FOIA") complaints against defendants,[1] which were consolidated under docket number 12-4042.  The complaints alleged that defendants conducted insufficient and dilatory FOIA searches and improperly withheld responsive records under certain FOIA exemptions and exclusions.[2]  Both sides have moved for summary judgment.  [D.E. 26 (12-5379)[3]; D.E. 26 (12-4042).]  As set forth below, defendants' motion is granted, and Qatanani's cross motion is denied.

**II.     Background**

**A.      Qatanani's Background**

Qatanani, a Jordanian national, immigrated to the United States in 1996 to join the Islamic Center of Passaic County, where he currently serves as Imam.  (D.E. 26-22 (12-4042), "Pl.'s Statement of Material Facts," ¶¶ 42, 51.)  In 1993, Israeli Defense Forces ("IDF") detained Qatanani while he was traveling to the West Bank and he was told to report to a military facility.  (*Id.* ¶ 43.)  Qatanani complied.  He claims that the IDF interrogated him about his connections with the Muslim Brotherhood, whether he was a former member, and what the Muslim Brotherhood's relationship was with Hamas in Jordan, and tortured him over a period of 30 days after which he signed a "finishing paper," which he states he could not understand because it was in Hebrew.  (*Id.* ¶¶ 43-48.)  After another 30 to 90 days of detention, the IDF released him.  (*Id.* ¶

---

[1] The reference to "defendants" includes all agencies named in the complaints.
[2] Although Qatanani and Slovinsky are both named as plaintiffs, the Court will only refer to Qatanani as the plaintiff because the FOIA requests were made on his behalf.
[3] The first time a document is cited the Court will indicate in parenthesis under which docket number it was filed.

49.)  Qatanani claims that he later learned that the "finishing paper" was used, unbeknownst to him, to support his conviction in Israel for providing support to Hamas.  (*Id.* ¶ 58.)

Qatanani entered the United States in 1996 with a religious worker visa.  (*Id.* ¶ 51.)  In 1999, before his visa expired, he applied to become a permanent resident.  (*Id.* ¶ 52.)  His application was not acted upon for approximately six years.  (*Id.* ¶ 53.)  In February 2005, along with counsel, Qatanani had a meeting with officials from the FBI and ICE in order to expedite his application.  (*Id.* ¶¶ 54-55.)  He told them about his detention by the IDF in 1993.  (D.E. 26-3 (12-4042), "Sept. 4, 2008 Immigration Decision" at 11.)  He denies telling the agents that the IDF arrested him; instead he states he characterized the incident as administrative military detention. (*Id.*; Pl's Statement of Material Facts, ¶ 50.)

The agents who conducted the interview in 2005 subsequently informed USCIS that the IDF had arrested Qatanani in the West Bank in 1993 and possibly convicted him.  (Sept. 4, 2008 Immigration Decision at 11.)  The FBI then contacted Israel to get records.  (*Id.*)

In May 2006, USCIS scheduled its own interview with Qatanani, which was also attended by Slovinsky, Qatanani's immigration attorney at the time.  (*Id.* at 11-12.)  When asked why he indicated on his immigration application that he was never arrested, Qatanani told the officials he had responded in the negative because the IDF did not "arrest" him for violating the law, but instead "detained" him without charging him with an offense.  (Pl.'s Statement of Material Facts, ¶ 56.)

A month later, in July 2006, USCIS denied Qatanani's application to become a permanent resident, citing two reasons: (1) that "Qatanani was inadmissible under [11 U.S.C. § 1182(a)(6)(C)(i)] for willfully making a material misrepresentation" on the application by not disclosing his "arrest"; and (2) that USCIS "determined that the positive equities were outweighed

3

by Qatanani's pattern of deception in dealing with the federal government."  (Sept. 4, 2008 Immigration Decision at 3.)

On the same day it denied Qatanani's application to become a permanent resident, USCIS began removal proceedings under 8 U.S.C. § 1227(a)(1)(B) on grounds that he had overstayed his visa.  (*Id.*)  Qatanani claims that the removal case "rested almost entirely on the strength of his supposed conviction" in Israel "for provid[ing] support to Hamas."  (Pl.'s Statement of Material Facts, ¶ 59.)  After an immigration hearing in February 2007, Qatanani renewed his application to become a permanent resident, which the Department of Homeland Security ("DHS") contested, arguing that he was still inadmissible pursuant to 11 U.S.C. § 1182(a)(6)(C)(i) and also § 1182(a)(3)(B)(i)(I) for engaging in terrorist activity.  (Sept. 4, 2008 Immigration Decision at 4.) In September 2008, an Immigration Judge ("IJ") ruled in Qatanani's favor, finding that the records that DHS had obtained from Israel were "too unreliable to prove" that Qatanani had engaged in terrorist activities because they were not properly authenticated and because Qatanani did not "willfully misrepresent a material fact" on his application.  (*Id.* at 68.)

DHS appealed, and the Board of Immigration Appeals ("BIA") reversed and remanded, holding that the IJ committed error by making an adverse credibility finding against the FBI and ICE agents, who had interviewed Qatanani and testified during the removal proceedings, and by concluding that the records DHS submitted from Israel were inadmissible.  (Pl.'s Statement of Material Facts, ¶ 63.)  The BIA remanded for further consideration in light of its opinion.

On remand, Qatanani sought to exclude other evidence that had been sent to the DHS containing statements he and other individuals had given while they were detained by the IDF. [D.E. 26-5 (12-4042).]  In an October 17, 2012 written decision, the IJ excluded certain third-party

statements but ordered that Qatanani's own statements arising from his detention were admissible. [D.E. 26-7 (12-4042).]  His immigration proceeding remains unresolved.

**B.**   **Qatanani's FOIA Requests**

In January 2010, while Qatanani's removal proceeding was pending, Slovinsky submitted FOIA requests on his behalf to the FBI and three units of DHS: USCIS, the CBP, and ICE.  [D.E. 26-9 (12-5379).]  The requests were nearly identical, but the one that is primarily before the Court was sent to ICE and sought:

> any and all records held by the [USCIS] regarding Dr. Qatanani, and any and all other records maintained by the [DHS] regarding him, including all hard copies of documents and computer records.  This request includes, but is not limited to, any and all documents, and electronic records pertaining to him from Israel, including any Israeli governmental agency, authority, board, bureau, branch, body commission, committee, department, division, group, office, or unit, including the military and the military court, as well as any Israeli non-governmental agency, authority, board, bureau, branch, body commission, committee, department, division, group, office, or unit.

(D.E. 26-5 (12-5379), "First Law Dec.," Ex. A.)  Slovinsky furnished alternative spellings of Qatanani's name and asked defendants to expedite the request, believing that responsive records would have relevance in his removal proceedings.  (*Id.*)

The agencies have provided declarations from their employees explaining how they conducted their FOIA searches and their reasoning for withholding records.  Some of these declarations have been submitted *ex parte* for *in camera* review because of the sensitive information they contain.   David M. Hardy ("Hardy"), the Section Chief of the FBI's Record/Information Dissemination Section, describes the agency's search procedure and withholdings in four declarations, two *ex parte*.  (D.E. 26-2 (12-5379); D.E. 26-3 (12-5379), "Second Hardy Dec."; D.E. 32-1 (12-4042), "Third Hardy Dec."; D.E. 32-11 (12-4042).)  The United States Citizenship and Immigration Service ("USCIS") provided two declarations from Jill

5

A. Eggleston ("Eggleston"), the Assistant Center Director of its FOIA Unit.  (D.E. 26-4 (12-5379), "First Eggleston Dec."; D.E. 32-2 (12-4042), "Second Eggleston Dec.")   Three declarations, one *ex parte*, were submitted by Ryan Law ("Law"), the United States Immigration and Customs Enforcement's ("ICE") Deputy FOIA Officer.  (First Law Dec.; D.E. 32-3 (12-4042), "Second Law Dec."; D.E. 32-10 (12-4042).)   The United States Customs and Border Protection ("CBP") provided one declaration, with redactions, from Jacky Joseph Saint Juste ("Saint Juste"), the Acting Director of its FOIA Division.  (D.E. 26-6 (12-5379), "First Saint Juste Dec.")  In addition, USCIS and ICE have submitted *Vaughn* Indices,[4] two of which are supplemental and created in response to Qatanani's cross motion for summary judgment, describing the documents withheld under each exemption and the reasons for withholding them under the claimed exemptions.

The FBI's FOIA search is detailed in Hardy's declarations.  The FBI examined its Central Records System ("CRS"),[5] onto which all of its employees load their files, including any handwritten notes.  (Second Hardy Dec., ¶ 17; Third Hardy Dec., ¶ 7.)   Using variations of "a phonetic breakdown" of Qatanani's name, birth date, and social security number, the FBI's first search focused on "locating potentially responsive main files."  (Second Hardy Dec., ¶ 17 n.3.)  It then broadened its examination to find documents that referenced or cross-referenced those search terms.  (*Id.* ¶ 18.)

---

[4] The concept of a *Vaughn* Index originated in *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1972).  Its purpose "is to help specify in a large document which portions of the document are disclosable and which are allegedly exempt." *Davin v. U.S. Dep't of Justice*, 60 F.3d 1043, 1053 (3d Cir. 1995).   The Index "subdivide[s] the document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justification" for claiming an exemption.  *Vaughn*, 484 F.2d at 827.  This allows the requestor to "consult with a view toward eliminating from consideration those portions that are not controverted and narrowing the scope of the court's inquiry."  *Id.*  This way, the "court will have an easier task 'rul[ing] on each element of the itemized list' than it would if the 'agency were permitted to make a generalized argument in favor of exemption.'"  *Davin*, 60 F.3d at 1053 (alteration in original) (quoting *Vaughn*, 484 F.2d at 827).
[5] CRS is searched by using "the Automated Case Support System ('ACS'), which itself is comprised of three integrated electronic applications": Investigative Case Management, Universal Index, and Electronic Case File.  (Third Hardy Dec., ¶ 6.)

The FBI located 279 pages in its investigative files and released 157 pages "in full or in part," withholding the remaining 122 pages because they were "foreign language duplicates" of those already produced in English.  (*Id.* ¶ 19.)  Later, the FBI released eight pages of handwritten notes, five in part and three in full, from the February 2005 interview between an FBI agent and Qatanani, after discovering that the notes had not been processed as part of its FOIA search.[6] (Third Hardy Dec., ¶ 8.)  The FBI also located other potentially responsive records but contends that they are subject to FOIA Exemption 7(A) because they are "part of active, ongoing criminal investigations."  (Second Hardy Dec., ¶ 20.)  As to the relevant enforcement proceedings, Hardy states in his second declaration that the FBI cannot publicly describe their scope or subject(s) "without divulging protected information about the focus and status of the proceedings."  (*Id.* ¶ 59.)  To explain the basis for applying the 7(A) exemption, the FBI provided relevant detail in an *ex parte* and *in camera* declaration, which the Court has reviewed.  In addition, the FBI received documents referred to it by ICE and USCIS from which it released all non-exempt information. (*Id.* ¶ 21.)

Ryan Law's first declaration indicates that ICE began its search by focusing on two of its sub-agencies: the Office of Enforcement and Removal Operations ("ERO") and the Office of Homeland Security Investigations ("HSI").  (First Law Dec., ¶ 8.)  HSI conducted a search of the TECS database[7] using Qatanani's Alien File ("A-File") number, name, and date of birth, which would likely reveal any responsive records.  (*Id.*)  On May 8, 2012, ICE informed Qatanani that a

---

[6] An interview memorandum corresponding to the handwritten notes had been processed and released to Qatanani on December 3, 2012.  (Third Hardy, Dec., ¶ 8 n.3.)

[7] "TECS is an overarching law enforcement collection, analysis, and sharing database that securely links government computers to a central system and database."  (First Saint Juste Dec., ¶ 11.)  TECs supports many federal agencies by collecting and maintaining data, and "conduct[ing] analysis, risk assessments, and information sharing."  (*Id.*)  TECs includes records important to anti-terrorism and law enforcement activities.  (*Id.*)

search of only HSI uncovered a three-page document pertaining to his immigration proceeding, which was being withheld in its entirety under Exemption 7(A).  (*Id.*, Ex. B.)

Qatanani filed an administrative appeal on May 25, 2012, that characterized ICE's use of Exemption 7(A) as "overbroad, vague, and in excess of statutory authority," and he also contended that the search should have included "all records held by all units" and not just HSI.  (*Id.*, Ex. C.) In a letter dated July 5, 2012, ICE indicated that a search of USCIS's records uncovered 55 additional pages of responsive documents that had originated with ICE and were being withheld in part pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E).[8]  (*Id.*, Ex. E.)  ICE denied Qatanani's appeal on July 9, 2012, and on August 22, 2012, his current counsel lodged a further appeal, which was denied on November 9, 2012.  (*Id.*, Exs. E, G, H.)

On October 16, 2012, ICE conducted another search of ERO[9] and HSI,[10] and on October 19, 2012, it expanded that search to the Office of Principal Legal Advisor ("OPLA").  (*Id.* ¶¶ 14, 15.)  OPLA focused on the Office of Chief Counsel in Newark, New Jersey, the National Security Law Section, and the Immigration Law and Practice Division as possible locations of responsive documents and utilized the same search terms as HSI, also including Qatanani's social security number and place of birth in its inquiry.  (*Id.*)  OPLA examined "electronic email folders, case management systems, and physical files relating to the subject matter of the request."  (*Id.*)  On March 1, 2013, during the course of this litigation, ICE produced an additional 2,800 documents from OPLA.  (*Id.* ¶ 25; D.E. 19 (12-4042).)

---

[8] These and other FOIA Exemptions are fully identified and discussed in the Court's analysis, *infra.*
[9] Office of Enforcement and Removal Operations.
[10] Office of Homeland Security Investigations.

USCIS[11] and the CBP[12] also located records responsive to Qatanani's FOIA requests. Eggleston explains in her declarations that USCIS found 834 responsive pages, and released 598 pages in their entirety, withheld 47 pages in part and 109 pages in full, and referred 80 pages to ICE and the FBI for review on March 29, 2012.  (First Eggleston Dec., ¶¶ 9, 12.)  USCIS relied on Exemptions 5, 6, 7(C), and 7(E) to withhold documents.  (*Id.*)  USCIS eventually produced another six pages in full and seven in part on July 2, 2012, after Qatanani appealed its response to his FOIA request.  (*Id.* ¶ 12.)  Then, while this summary judgment motion was pending, USCIS released further information from six documents it previously withheld.  (Second Eggleston Dec., ¶ 6.)  The CBP, as discussed in Saint Juste's declaration, disclosed 86 responsive pages with redactions made pursuant to Exemptions 3, 6, 7(C), and 7(E).  (First Saint Juste Dec., ¶¶ 13, 14.)

Qatanani filed his FOIA lawsuit in this Court against the FBI and the CBP on June 29, 2012, claiming that the agencies failed "to grant expedited processing," neglected to respond to his request within 20 days, failed to produce any responsive records, and conducted an inadequate search.  [D.E. 1 (12-4042).]  Qatanani then filed a second complaint on August 24, 2012, against USCIS, ICE and, again, the FBI with nearly identical allegations as his first complaint.  [D.E. 1 (12-5379).]  The cases were consolidated under docket number 12-4042 in November 2012.  [D.E. 13 (12-4042).]  Qatanani filed an amended complaint in the second action under docket number 12-5379 on February 20, 2013.  [D.E. 20 (12-5379).]  The motion practice under consideration followed.

---

[11] United States Citizenship and Immigration Service.
[12] United States Customs and Border Protection.

### III.   Discussion

In addressing summary judgment motions in a FOIA case like this, the trial court must review *de novo* the agencies' submissions proffered to determine whether there has been an adequate search and, where material is withheld, whether the justifications offered are "not contradicted by contrary evidence in the record or by the agency's bad faith." *A.C.L.U. v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011).

The court will grant the agency summary judgment when its search is challenged if it shows "beyond a material doubt that it has a conducted a search reasonably calculated to uncover all relevant documents." *Morley*, 508 F.3d at 1114; *see also Lechliter v. Rumsfeld*, 182 F. App'x 113, 115 (3d Cir. 2006) ("Under the FOIA, an agency has a duty to conduct a reasonable search for responsive records.")  The necessary inquiry regarding the reasonableness of the search is not whether any other possible responsive documents exist, "but rather whether the *search* for those documents was *adequate*." *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 584, 551 (D.C. Cir. 1994) (quoting *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)) (internal quotation marks omitted).  "To demonstrate the adequacy of its search, the agency should provide a 'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched.'" *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 488 F.3d 178, 182 (3d Cir. 2007) (alteration in original) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999)).

When the agency's use of exemptions is challenged, the court will rule in its favor if the agency's affidavits "describe[] the justifications for withholding the information with specific detail" and "demonstrate[] that the information withheld logically falls within the claimed exemption." *A.C.L.U. v. U.S. Dep't of Defense*, 628 F.3d at 619.  Substantial weight should be

accorded "to an agency's affidavit concerning the details of the classified status of the disputed record." *A.C.L.U. v. Dep't of Justice*, 681 F.3d 61, 29 (2d Cir. 2012) (quoting *Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C. Cir. 2007)) (internal quotation marks omitted). The *Vaughn* Indices are also essential to the court's inquiry because they "establish a detailed factual basis for application of the claimed FOIA exemptions to each document withheld. . . . [T]he hallmark test is 'that the [requestor] and the trial judge be able to derive from the index a clear explanation of why each document or portion of a document withheld is putatively exempt from disclosure.'" *Davin*, 60 F.3d at 1049-50 (quoting *Hinton v. Dep't of Justice*, 844 F.2d 126, 129 (3d Cir. 1988)).

As the D.C. Circuit explained the in *King v. United States Department of Justice*, 830 F.2d 210, 218-19 (D.C. Cir. 1987) (alterations in original) (citations and footnotes omitted):

> The significance of agency affidavits in a FOIA case cannot be underestimated. As, ordinarily, the agency alone possesses knowledge of the precise content of documents withheld, the FOIA requester and the court both must rely upon its representations for an understanding of the material sought to be protected. As we observed in *Vaughn v. Rosen*, "[t]his lack of knowledge by the party seeing [*sic*] disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution," with the result that "[a]n appellate court, like the trial court, is completely without the controverting illumination that would ordinarily accompany a lower court's factual determination." Even should the court undertake in camera inspection of the material - an unwieldy process where hundreds or thousands of pages are in dispute - "[t]he scope of the inquiry will not have been focused by the adverse parties . . . ."

> Affidavits submitted by a governmental agency in justification for its exemption claims must therefore strive to correct, however, imperfectly, the asymmetrical distribution of knowledge that characterizes FOIA litigation. The detailed public index which in *Vaughn* we required of withholding agencies is intended to do just that: "to permit adequate adversary testing of the agency's claimed right to an exemption," and enable "the District Court to make a rational decision whether the withheld material must be produced without actually viewing the documents themselves, as well as to produce a record that will render the District Court's decision capable of meaningful review on appeal." Thus, when an agency seeks to withhold information, it must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." Specificity is the defining requirement of the

11

*Vaughn* index and affidavit; affidavits cannot support summary judgment if they are "conclusory, merely reciting statutory standards, or if they are too vague or sweeping." To accept an inadequately supported exemption claim "would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review."

## A.     ICE's FOIA Search

Qatanani first challenges ICE's search because it did not include offices of senior management.  He notes that ICE's *Vaughn* Index entry nos. 28, 32, 40, and 83 describe discussions about draft reports and Significant Case Reports ("SCR") intended for ICE senior officials. According to Qatanani, the senior officials must have received final versions of the rough drafts, which ICE failed to locate and, as a result, should have expanded its search to those officials' offices.

If the Court adopted Qatanani's premise, the determinative factor for the reasonableness of a FOIA search would be its results.  However, "the adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). Furthermore, ICE need not scour every office to locate responsive records absent a finely tailored request identifying specific documents or places to search, nor must it expand its search based on speculations derived from vague references without a "positive indication of overlooked materials."  *Founding Church of Scientology v. N.S.A.*, 610 F.2d 824, 837 (D.C. Cir. 1979) (finding, in light of a well-defined FOIA request identifying specific material, that a search was inadequate).  The Court finds that ICE was not required to search the offices of senior officials.

Qatanani claims ICE's search was also unreasonable based on an alleged failure to examine the files of the agent who interviewed him in February 2005.[13]   The Court reviewed ICE's *ex parte* declaration and is satisfied that the search was adequate.

Qatanani also asserts that ICE's search was "dilatory and incomplete."  While ICE delayed in extending its search to OPLA, which yielded a large cache of documents, the delay alone does not render the search unreasonable.  *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982) (finding that an agency's FOIA search was reasonable even though belated).  Law's first declaration details the terms ICE used in its search and explains the method it used to search TECS.  (First Law Dec., ¶ 20.)  He also states that ICE "determined that ERO, HSI, and OPLA [were] the only offices within ICE that are reasonably likely to have records responsive to the request" and that it concluded "that no other agency office is likely to have additional responsive documents subject to FOIA within its possession and control."  (*Id.* ¶ 24.)  The Court is satisfied that ICE conducted an adequate search that was reasonably calculated to locate responsive records because it submitted an affidavit explaining the search terms used, how it performed its search, and averring that it searched all locations likely to have responsive records and also because Qatanani has not shown any facts contradicting those in ICE's affidavit.  *Abdelfattah*, 488 F.3d at 182.

### B.   Defendants' FOIA Exemptions

#### 1.   Exemption 5

Exemption 5 permits an agency to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  It safeguards "those documents that would be 'normally privileged in the civil discovery context.'"  *Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 85 (3d

---

[13] Qatanani withdrew a similar argument regarding the FBI agent's notes after the FBI released them.

Cir. 2014) (quoting *Conoco, Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 727 (3d Cir. 1982)).  This includes documents shielded by the deliberative process, attorney work product, and attorney-client privileges.  *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

Qatanani challenges ICE's use of Exemption 5 for excluding portions or the entirety of *Vaughn* Index entry nos. 5, 6, 28, 31, 32, 34, 37, 40, 41, 54, 63, 67, 70, 76, 82, 83, 84, 85, 86, 100, and 104.  In addition, Qatanani also asserts that USCIS is not entitled to withhold the records Bates Stamped 259-61, 335, 350, 367-68, 372, 374-75, 378-81, 412-17, 466, 467-76, 479-80, and 493-95.  Since Qatanani filed his cross motion for summary judgment, USCIS has withdrawn its use of Exemption 5 over the documents Bates Stamped 466 and 479-80, and therefore, his argument is moot as to those records.  (Second Eggleston Dec., ¶ 7.)  ICE and USCIS have also provided Supplemental *Vaughn* Indices containing more detailed descriptions of their Exemption 5 withholdings to further aid the Court's review.  (*See* Supplemental ICE *Vaughn* Index; D.E. 32-2 (12-4042), "Supplemental USCIS *Vaughn* Index.")

### a.    Deliberative Process Privilege

The purpose of the deliberative process privilege is to promote "frank discussion essential to the development of carefully formulated, coherent agency policy."  *Montrose Chem. Corp. of Cal. v. Train*, 491 F.2d 63, 66 (D.C. Cir. 1974).  It "protects documents that are both predecisional and deliberative."  *Abdelfattah*, 488 F.3d at 183 (quoting *Judicial Watch*, *Inc. v. F.D.A.*, 449 F.3d 141, 151 (D.C. Cir. 2006)) (internal quotation marks omitted).  A document is predecisional if it was drafted to aid a decision maker in reaching his or her decision, and it is deliberative if it "reflects the given-and-take of the consultative process."  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (citations and internal quotation marks omitted).

While purely factual material is not normally afforded protection by the deliberative process privilege, "in some instances, 'the disclosure of even purely factual material may so expose the deliberative process within an agency'" that Exemption 5 forestalls its release. *Id.* (quoting *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 256 (D.C. Cir. 1977)).

Qatanani claims that among ICE's withholdings are final drafts that are not protected by the deliberative process privilege because they were adopted as a formal policy position by the agency.  He also alleges that USCIS has wrongfully withheld purely factual material under the deliberative process privilege.

According to Ryan Law, ICE invoked the deliberative process privilege "to protect from disclosure draft pleadings, including a significant volume of records regarding the immigration appeal, and other draft documents and correspondence that were created as well as deliberative discussions between counsel and other agency employees in the preparation of these materials." (First Law Dec., ¶ 32.)  These records consist of intra-agency opinions, recommendations, and discussions that occurred during Qatanani's removal proceeding.  For example, entry no. 5 in the supplemental ICE *Vaughn* Index describes a debate between ICE attorneys on the potential use of the Israeli documents in Qatanani's removal proceeding.  (*Id.*, entry no. 5.)  Entry no. 84 details e-mail correspondence among the agency's attorneys in which they analyze the legal restrictions on releasing a draft of its BIA[14] brief to then-New Jersey Governor Corzine.   The other entries in ICE's *Vaughn* index describe the reasons it withheld those documents under the deliberative process privilege with the same level of detail and provide logical reasons for invoking Exemption 5.  The Court finds that ICE has justified its withholdings under the deliberative process privilege because those documents "reflect predecisional attitudes" and embody the "give-and-take"

---

[14] Bureau of Immigration Appeals.

regarding "policy alternatives" in Qatanani's removal proceeding that "are not required to be disclosed." *Cuccaro v. Sec'y of Labor*, 770 F.2d 355, 358 (3d Cir. 1985).

Qatanani's contention that ICE erroneously withheld final drafts misconstrues a key distinction between a final agency policy and a final draft document.  The issue is not whether a document is a final or rough draft, but "whether the document is recommendatory . . . and whether the document is deliberative in nature, weighing the pros and cons of agency adoption of one viewpoint or another" or is instead an interpretation of agency policy.  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).  Only when the memorandum or document embodies an "interpretation[] of established policy" must it be disclosed.  *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7-8 (D.C. Cir. 2014) (citation and internal quotation marks omitted).  Thus the concern is not whether a document constitutes a finished product, as Qatanani claims, but whether it is part of the agency's body of "working law."  *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 152-53 (1975).

One document Qatanani points to, an SCR, described in ICE's Supplemental *Vaughn* Index, is acknowledged by ICE to appear to be a final draft.  ICE justifies withholding the document because OPLA had yet to act upon the suggestions in the SCR and its disclosure would reveal litigation strategy because it "outline[d] the proposals of counsel not yet approved for action."  (Supplemental ICE *Vaughn* Index, entry no. 31.)  Accepting this description, the Court finds the document remains deliberative and predecisional because it recommends and analyzes litigation strategy and its recommendations had yet to be acted on.  There is no indication that this SCR or any other withholdings that Qatanani challenges constitute formal interpretations of established ICE policy or later became policy, and therefore, the Court finds that ICE has not wrongfully withheld its "working law" under the deliberative process privilege.

In its Supplemental *Vaughn* Index, USCIS describes its decision to withhold factual material in one memorandum stating that the facts "were chosen because they were perceived by an [USCIS] officer as necessary in educating an [USCIS] decision maker, and recommending future action . . . [.] Disclosure of the factual information would compromise the confidentiality of deliberations." (Supplemental USCIS *Vaughn* Index at 1.)  USCIS has declared that it released all segregable factual content from the records it has withheld and that facts not released "are intertwined with, and germane to, inter-office discussions on the adjudication of Qatanani's" immigration application deemed "necessary to inform the actions of Agency decision makers." (*Id.* at 2; *see also id.* at 3, 6.)  Because these facts were selected from among a larger set to aid in the decision making process, they are protected by the deliberative process privilege.  *Petroleum Info. Corp.*, 976 F.2d at 1434.  This work of "separating the wheat from the chaff" when summarizing factual material for an agency decision maker is part of the deliberative process and subject to Exemption 5.  *Montrose Chem.*, 491 F.2d at 71.

### b.   <u>Work Product Privilege</u>

The work product privilege shields the "mental processes of the attorney."  *Klamath*, 532 U.S. at 8 (citation and internal quotation marks omitted).  It ensures "the confidentiality of papers prepared by or on behalf of attorneys in anticipation of litigation."  *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991).  The doctrine is to be afforded deference and "should be interpreted broadly and held largely inviolate."  *Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005) (citing *Hickman v. Taylor*, 329 U.S. 495, 510-511 (1947)).  And, unlike the deliberative process privilege, factual material, no matter its use, is privileged if contained within a document prepared in anticipation of litigation.  *Id.* at 371; *see also Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1261 (3d Cir. 1993) (holding

that under Fed. R. Civ. P. 26(b)(3) the definition of attorney work product includes solely factual material).

Qatanani alleges that ICE has improperly withheld records comprised of primarily factual material under the work product privilege.  Many of the documents that ICE invokes the work product privilege over consist of case summaries, case reports, and legal analyses prepared during Qatanani's removal proceeding.[15]  (Supplemental ICE *Vaughn* Index, entry no. 28, 31, 32, 34, 37, 40, 41, 63, 76, 83, 84, 85, 86.)  These types of documents traditionally lie within the realm of attorney work product.  *See Tax Analysts v. I.R.S.*, 117 F.3d 607, 620 (D.C. Cir. 1997) ("Any [document] prepared in anticipation of litigation, not just portions concerning opinions, legal theories, and the likes, is protected by the work product doctrine and falls under exemption 5."); *see also Norwood v. F.A.A.*, 993 F.2d 570, 576 (6th Cir. 1993) (holding that case summaries are included within the work product privilege).  Considering the broad scope a court should afford the work product doctrine, the Court finds that ICE has demonstrated its right to invoke it under Exemption 5.

### c.       **Attorney-Client Privilege**

The attorney-client privilege shelters "confidential communications between government counsel and their clients that are made for the purpose of obtaining and providing legal assistance." *Brennan Ctr. for Justice v. U.S. Dep't of Justice*, 697 F.3d 184, 207 (2d Cir. 2012) (citation and internal quotation marks omitted).  A document containing confidential communications will be entitled to the privilege's protection so long as it was "circulated only among members 'of the [agency] who are authorized to speak or act for the [agency] in relation to the subject matter of the

---

[15] The documents ICE claims are protected by the work product doctrine are the same documents it withholds under the deliberative process privilege, except for two, for which it found the work product privilege did not apply.  (ICE Supplemental *Vaughn* index, entry no. 5, 6.)

communication.'" *Coastal States Gas Corp. v. Dep't of Energy*, 644 F.2d 969, 977 n.38 (3d Cir. 1981) (quoting *Mead Data*, 566 F.2d at 253 n.24).   If the information contained in the communication is expressly incorporated as policy or disclosed, the privilege is lost.  *See Brennan Ctr. For Justice*, 697 F.3d at 207.

Qatanani challenges five documents labeled as SCRs[16] that ICE claims are protected by the attorney-client privilege: ICE *Vaughn* Index entry nos. 37, 41, 63, 67, and 85.  He contends that "there is no basis in the record" for ICE to withhold these documents under the attorney-client privilege and that, in any event, it waived the privilege by widely disseminating them.

Upon reviewing ICE's Supplemental *Vaughn* Index, the Court finds that ICE properly withheld entry nos. 37, 41, 63, and 85 under the attorney-client privilege because the documents described involve confidential communications between OPLA and senior officials at ICE. However, the Court is not persuaded that entry number 67 qualifies as communications under the attorney-client privilege because it only contains discussions between agency attorneys regarding docketing matters.   Nevertheless, ICE also invoked the deliberative process privilege for withholding this entry, and the Court finds that it has justified its withholding under that privilege because the record discusses litigation strategy regarding scheduling and motion practice following the BIA's remand.

### 2.   <u>Exemption 7</u>

Qatanani also takes issue with ICE's use of Exemption 7(C), (D), and (E), and the CBP's and USCIS's reliance on Exemption 7(C) and (E).  He further claims that the FBI failed to offer a sufficient basis for its withholdings under Exemption 7(A) and (C).

---

[16] Significant Case Reports

a.    **Exemption 7(A)**

As a threshold matter, under Exemption 7 an agency has the burden to prove that the records were compiled for law enforcement purposes. *John Doe Agency*¸ 493 U.S. at 153.  It is unnecessary that the documents originally be compiled for such purposes so long as they were compiled for law enforcement purposes at the time the FOIA request was made. *Id.* at 155.  The agency is not required to identify a particular incident for which the records were compiled; it must only put forth a "colorable claim" that the records were compiled while exercising its law enforcement authority. *Abdelfattah*, 488 F.3d at 185-86.

As an initial argument, Qatanani alleges that ICE failed to establish that the records ERO and HSI withheld meet the threshold requirement of Exemption 7.   The Court has reviewed the *ex parte* declaration submitted on behalf of ICE and is satisfied that the records in question meet the threshold requirement of having been compiled for law enforcement purposes.

Exemption 7(A) allows an agency to withhold records "complied for law enforcement purposes" if the disclosure of that information "could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).  For Exemption 7(A) to apply, the agency must demonstrate "that (1) a law enforcement proceeding is pending or prospective and (2) release of the information could reasonably be expected to cause some articulable harm." *Manna*, 51 F.3d at 1164.

Hardy's first declaration states that, in withholding records under Exemption 7(A), the FBI grouped documents into two categories labeled "Evidentiary/Investigative Materials" and "Administrative Materials," and further divided each category into three subcategories.  (Second Hardy Dec., ¶¶ 63, 71.)  This method was employed instead of providing a document-by-document *Vaughn* Index.   Included within "Evidentiary/Investigative Materials" are confidential source

statements, exchanges of information between the FBI and other law enforcement agencies, and information concerning documentary and physical evidence.  (*Id.* ¶¶ 64-66.)  The category "Administrative Materials" consists of reporting communications, miscellaneous administrative documents, and administrative instructions.  (*Id.* ¶¶ 68-72.)

Qatanani challenges the decision not to provide a document-by-document *Vaughn* Index. However, an agency may submit a *Vaughn* Index that describes documents by category when a document-by-document index would reveal the very information the agency seeks to protect. *A.C.L.U. v. C.I.A.*, 710 F.3d 422, 432 (D.C. Cir. 2013).  Having reviewed the FBI's *ex parte* declarations, the Court finds that its methodology here is appropriate.

The Court further finds that the category-by-category *Vaughn* Index sufficiently details the materials withheld and the resulting harm that their release would cause.  For instance, the FBI explains that the release of confidential source statements could cause the sources to face "retaliation, intimidation, or physical harm."  (Second Hardy Dec., ¶ 64.)  This would likely hamper investigations and prosecutions by discouraging current, or potential, confidential sources from continuing to cooperate or coming forward with information in the future.  (*Id.*)   The FBI also explains the possible harm created from disclosing miscellaneous administrative documents. (*Id.* ¶¶ 69-70.)  While used for routine purposes, these materials, such as envelopes, contain dates, places, and names of persons, that would allow an individual seeking to impede or avoid law enforcement to "identify[] witnesses, investigative strategies and items of evidence."  (*Id.* ¶ 70.) The FBI provides the same level of detail under the other four subcategories and logically connects their disclosure to an articulable harm.  Therefore, the Court finds that the FBI has provided sufficient justifications for its withholdings under Exemption 7(A).

**b.**     **Exemption 6 and Exemption 7(C)**

Pursuant to Exemption 7(C), an agency may refuse to disclose information "compiled for law enforcement purposes" when its production "could reasonably be expected to constitute an unwarranted invasion of privacy."  5 U.S.C. § 552(b)(7)(C).  When an agency raises Exemption 7(C), the requestor must put forth a significant public interest -- "an interest more specific than having the information for its own sake.  Second, the [requestor] must show the information is likely to advance that interest.  Otherwise, the invasion of privacy is unwarranted." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 173 (2004).  "Absent proof of [government] misconduct," there is little reason to invade the privacy interests shielded by Exemption 7(C). *Manna*, 51 F.3d at 1166.

Exemption 6 also allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).  Exemption 6 contemplates a similar balancing of interests.  *McDonnell*, 4 F.3d at 1252.  Yet, if a record may be withheld under Exemption 7(C), an agency need not resort to Exemption 6 because of Exemption 7(C)'s broader language.  *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989).

Under Exemption 6 and Exemption 7(C), the FBI withheld records that would reveal the names and other identifying information of special agents, support employees, and third parties mentioned in FBI records.  (*Id.* ¶¶ 46, 49, 51.)  USCIS withheld information that might provide the names of "adjudication officers, senior adjudications officers, special agents, supervisory agents and other law enforcement personnel, and other USCIS employees."[17]  (Second Eggleston

---

[17] The FBI, ICE, and CBP have raised Exemption 7(C) to prevent disclosure of the same documents that they rely on Exemption 6 to withhold.  (Second Hardy Dec., ¶ 46; First Law Dec., ¶ 38; First Saint Juste Dec., ¶¶ 16, 17.)  USCIS used Exemption 7(C) as a basis to withhold the same documents it did so under Exemption 6 as well, but it also relies Exemption 7(C) to withhold records it did not rely on Exemption 6 in withholding.  (First Eggleston Dec., Ex. G.)

Dec., ¶ 10.)   ICE employed Exemption 6 and Exemption 7(C) to avoid disclosing names of government employees, special agents, "Deportation Officers, Legal Officers, [and] enforcement officers."  (First Law Dec., ¶ 39.)   The CBP withheld terminal identifier numbers of employees who conducted the FOIA search stating that it would allow a person to identify that employee, and it also withheld telephone numbers of employees responsible for maintaining records.  (First Saint Juste Dec., ¶ 19.)  Qatanani argues that all four agencies failed to satisfy their burden under both Exemption 6 and Exemption 7(C) regarding two categories of information withheld: (1) the names of government officials that are publicly known to be involved in his removal proceeding; and (2) the names of senior officials who by the nature of their positions have a diminished expectation of privacy.[18]

In challenging defendants' invocation of Exemption 6 and Exemption 7(C), Qatanani argues that the public has a significant interest in knowing why the government targeted him for deportation based on a "purported conviction" occurring 20 years ago that he claims rested on a "'confession' obtained through torture."  But he originally submitted his FOIA request in order to get information he thought would be relevant in his removal proceeding, a purely personal interest. (First Law Dec., Ex. A.)  Qatanani also provides no evidence that the individuals whose identities he wants revealed engaged in any government misconduct, and even if their identities are already publicly known or if they possessed a diminished privacy interest, these persons still retain a privacy interest entitled to protection under Exemption 7(C).  *See Massey v. F.B.I.*, 3 F.3d 620, 624 (2d Cir. 1993) (holding that individuals do not waive their privacy interests under Exemption 7(C) by having their identities publicly disclosed), *abrogated on other grounds*, *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 163 (2011).   In general, Qatanani's "bare suspicion" of government

---

[18] USCIS declares that it has not withheld any names of "known high level officials" pursuant to Exemption 6 or 7(C). (Second Eggleston Dec., ¶ 10.)

misconduct is insufficient to invade the privacy interests defendants seek to guard.  *See Favish*, 541 U.S. 174.  The Court is satisfied that defendants adequately justified their withholdings under Exemption 6 and Exemption 7(C).

<strong>c.        Exemption 7(D)</strong>

Information withheld under Exemption 7(D) must be "compiled for law enforcement purposes," and its production "could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis."  5 U.S.C. § 552(b)(7)(D).  ICE did not submit a document-by-document *Vaughn* Index describing its Exemption 7(D) withholdings, stating that doing so would reveal the identity of sources who received assurances of confidentiality and that identification of those sources could result in their harm or harassment and because it "would itself disclose protected information by revealing the degree to which material provided by a confidential source was obtained and used by the agency."  (First Law Dec., ¶ 14; First ICE *Vaughn* Index, entry no. 105.)

Qatanani asserts that ICE must offer a document-by-document *Vaughn* Index and contends that without a more detailed description than ICE has provided, a conclusion cannot be made that the sources were given any assurance of confidentiality.  He further argues that ICE's confidential source appears to be another law enforcement agency, which he claims is not entitled to same assurances of confidentiality as a person.  Having reviewed ICE's *ex parte* declaration, the Court finds that the production of the records it withholds under Exemption 7(D) would reveal the identity of its confidential sources.

24

### d.    Exemption 7(E)

An agency may withhold records under Exemption 7(E) that are "compiled for law enforcement purposes" when their production "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).  An agency's burden in asserting exemption 7(E) is relatively low because, "[r]ather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011) (alteration in original) (citation and internal quotation marks omitted).

ICE withheld database codes and case organization descriptions on grounds that their disclosure would aid "individuals seeking to evade apprehension . . . to access, alter and avoid detection through manipulation of Law Enforcement database systems." (First ICE *Vaughn* Index, entry no. 3.)  The CBP asserted Exemption 7(E) with respect to an internal secure website address in order to prevent individuals from compromising its computer system that is essential to its law enforcement decisions.  (First Saint Juste Decl., ¶¶ 34-35.)  USCIS invoked Exemption 7(E) to withhold communications and instructions for interactions with immigration applicants and information gathering techniques because it would impede its ability to adjudicate immigration applications.  (First Eggleston Dec., Ex. G.)  The Court finds that the three agencies offered logical (and obvious) reasons why the information's release might create serious risks.  Considering the low bar the agencies must satisfy, *see Blackwell*, 646 F.3d at 42, after reviewing their *ex parte*

declarations, the Court finds that ICE, the CBP, and USCIS properly withheld documents under Exemption 7(E).

### 3.    Exemption 1 and Exemption 3

The FBI also withheld records under Exemption 1, and the CBP did so under Exemption 3.  Qatanani has withdrawn his allegations regarding the FBI's and the CBP's use of these exemptions.  After reviewing the FBI's and CBP's *ex parte* declarations, the Court finds the FBI has justified its withholdings under Exemption 1, and the CBP has done so with those records withheld pursuant to Exemption 3.

### C.    Exclusions Under Section 552(c)

On receiving a FOIA request, an agency may treat certain records as not subject to FOIA in three express circumstances under 5 U.S.C. § 552(c).

> (c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and
>
> > (A) the investigation or proceeding involves a possible violation of criminal law; and
> >
> > (B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,
>
> the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.
>
> (2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.
>
> (3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as

the existence of the records remains classified information, treat the records as not subject to the requirements of this section.

These exclusions differ from FOIA's exemptions in that they allow an agency to refuse to acknowledge whether or not records responsive to a FOIA request even exist. *A.C.L.U. of N.J. v. Dep't of Justice*, No. 11-2553, 2012 WL 466515, at *5 (D.N.J. Oct. 2, 2012) (Salas, J.); *see also Benavides v. D.E.A.*, 968 F.2d 1243, 1246 (D.C. Cir. 1992) (stating that § 552(c) allows an agency to refuse to confirm or deny whether responsive records exist). Instead, the Government may submit an *in camera* declaration for the court to review explaining that an exclusion was not invoked, or that an exclusion was properly invoked. *Steinberg v. U.S. Dep't of Justice*, No. 93-2409, 1997 WL 349997, at *1 (D.D.C. June 18, 1997).

Qatanani argues that defendants wrongfully excluded responsive documents under § 552(c) and requests that defendants provide the Court with information regarding their use of the exclusions, "*in camera* if necessary," to determine whether they invoked any exclusions and to assess the propriety of their use.

The defendants have submitted an *in camera* declaration to the Court in response to Qatanani's claim regarding § 552(c). The Court has reviewed the submission, and finds that if an exclusion was invoked, it was and remains justified.

## IV.   <u>Conclusion</u>

Defendants' motion for summary judgment is granted and Qatanani's cross motion for summary judgment is denied. An appropriate order will be entered.


/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.

Dated:  March 31, 2015